UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

LEE ALEXANDER as Mayor of the City of
Syracuse; THOMAS F. HANLON, as Chief
of Fire of the Syracuse Fire Department;
THOMAS J. SARDINO, as Chief of Police of the
Syracuse Police Department; and CITY OF
SYRACUSE;

                              Plaintiffs,

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
Syracuse/Onondaga Chapter,

                              Intervenor Plaintiff,

           -v-                                        5:78-CV-392

VICTOR S. BAHOU, as President of the Civil
Service Commission of the State of New York;
JOSEPHINE L. GAMBINO, as Commissioner of
and Constituting, the Civil Service Commission
of the State of New York; JAMES T.
McFARLAND, as Commissioner of and
Constituting, the Civil Service Commission of
the State of New York; and EDWARD J.
GUSTY, Commissioner of the Department of
Personnel of Onondaga County,

                              Defendants,
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

                              Plaintiff,

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
Syracuse/Onondaga Chapter,

                              Intervenor Plaintiff,

           -v-                                        5:80-CV-53

CITY OF SYRACUSE, a municipal
corporation; LEE ALEXANDER, as Mayor of
the City of Syracuse; THOMAS F. HANLON,
as Chief of Fire of the Syracuse Fire

Department; SYRACUSE FIRE
DEPARTMENT; THOMAS J. SARDINO,
as Chief of Police of the Syracuse Police
Department; SYRACUSE POLICE
DEPARTMENT; VICTOR S. BAHOU,
as Commissioner of and constituting the New
York State Civil Service Commission;
JOSEPHINE L. GAMBINO, as Commissioner
of and Constituting the New York State Civil
Service Commission; JAMES T. McFARLAND,
as Commissioner of and Constituting the New
York State Civil Service Commission;
NEW YORK STATE MUNICIPAL TRAINING
COUNCIL; and EDWARD J. GUSTY,
Local Personnel Officer, County of Onondaga,

                              Defendants,

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -


APPEARANCES:                                   OF COUNSEL:

HANCOCK ESTABROOK, LLP                         JOHN G. POWERS, ESQ.
Attorneys for City of Syracuse                 MARY L. D'AGOSTINO, ESQ.
1800 AXA Tower I
100 Madison Street
Syracuse, New York 13202

CITY OF SYRACUSE CORPORATION COUNSEL           KRISTEN E. SMITH, ESQ.
Attorneys for City of Syracuse
233 East Washington Street Room 300
City Hall
Syracuse, New York 13202

UNITED STATES DEPARTMENT OF JUSTICE-ENRD        ROBERT RICH, ESQ.
Attorneys for the United States
4 Constitution Square
150 M Street Northeast
Washington, District of Columbia 20002

UNITED STATES DEPARTMENT OF JUSTICE-CRD        ALICIA D. JOHNSON, ESQ.
Attorneys for the United States                JOHN P. BUCHKO, ESQ.
950 Pennsylvania Avenue Northwest Room 4018
Washington, District of Columbia 20530

HON. ANTOINETTE T. BACON                    THOMAS J. SPINA, ESQ.
Acting United States Attorney for the       Assistant United States Attorney
Northern District of New York
Attorneys for the United States
445 Broadway, Room 218
Albany, New York 12207

HON. LETITIA JAMES                          COLLEEN D. GALLIGAN, ESQ.
New York State Attorney General             Assistant Attorney General
Attorneys for Defendants
The Capitol
Albany, New York 12224

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

## I.    INTRODUCTION

Currently before the Court is a motion purporting to resolve a decades-old pair of lawsuits that were brought to address racial and sex-based discrimination in hiring practices for the police and fire departments of the City of Syracuse ("Syracuse" or "the city").  Both the city and the Department of Justice ("the government") filed causes of action in 1978 and 1980, respectively, seeking to challenge the civil service hiring requirements imposed by New York State ("New York" or "the state").  Those causes of action both fundamentally argued that the imposed hiring requirements unconstitutionally disfavored African Americans and women in the police and fire departments, although the government also looked to take the city to task for its own culpability in its hiring disparities.

Ultimately, the parties reached a settlement in 1980, resulting in a consent decree (the "consent decree") that had the effect of permitting Syracuse to institute a hiring preference for African American and women candidates notwithstanding the civil service requirements. Some forty years later, the government has moved to modify—and ultimately dissolve—the

3

consent decree under Federal Rule of Civil Procedure ("Rule") 60(b)(5).  That motion will now

be decided on the basis of the parties' submissions and oral arguments held on Friday,

November 13, 2020.

## II.   <u>BACKGROUND</u>

On August 7, 1978, Lee Alexander, then-mayor of Syracuse, Thomas Sardino, the

city's then-police chief, and Thomas Hanlon, the city's then-Fire Chief (together "the Syracuse

plaintiffs") filed the present case seeking a declaratory judgment against the New York State

Civil Service Commission.  Dkt. 1; Dkt. 12 ("Decree Order"), pp. 3-4.[1]  Essentially, the

Syracuse plaintiffs objected to the practical consequences of New York Civil Service Law's

requirement that all appointments to the police and fire departments must come from the

three eligible candidates with the highest scores on the civil service exam.  *Id.*  That

requirement, colloquially called the "rule of three," is currently codified in New York Civil

Service Law § 61 ("§ 61").

Essentially, the Syracuse plaintiffs believed that § 61's hiring requirements put them on

the horns of a dilemma.  Decree Order pp. 2-3.  On the one hand, the Syracuse plaintiffs

could have continued to follow the rule of three, despite mounting evidence that the exam's

results "uniformly resulted in white males occupying the three highest positions on the list of

eligible candidates . . . ."  *Id.* at 3.  But the Syracuse plaintiffs were concerned that walking

this path would open them to federal civil and criminal liability by allowing racial imbalance to

run unchecked.  *Id.*

Alternatively, the Syracuse plaintiffs could have disregarded the rule of three to more

actively foster diversity.  Decree Order 2-3.  Although this method would avoid federal liability,

violating § 61 would instead open the doors to *state* civil and criminal liability.  *Id.* at 3.

---

[1] Pagination corresponds with CM/ECF.

Rather than let the inevitable encroach on them, the Syracuse plaintiffs cut their own path by asking this Court to allow them to deviate from the hiring lists and increase their minority hires.  Decree Order 3-4.  After the Syracuse plaintiffs filed suit, the parties entered negotiations to settle the dispute without unnecessary litigation.  *Id.* at 4.  Those negotiations dragged on with little profit.  *Id.*

On January 16, 1980, apparently fed up with the lack of momentum in this case, the government filed its own suit under Title VII of the Civil Rights Act of 1964 ("Title VII") against all parties involved in the initial lawsuit, as well as against the New York State Municipal Training Council.  Decree Order 4.  On March 19, 1980, the parties at last announced a settlement and proposed a consent decree.  *Id.* at 5.

The consent decree first consolidated the Syracuse plaintiffs' and government's cases.  Dkt. 49-3 ("Consent Decree"), p. 3.  More importantly, that agreement identified its own objectives and—as a consequence—the objectives of the settling parties.

One of the long-term goals of the consent decree was to employ African Americans "in all ranks within the fire and police departments in numbers approximating their representation within the labor force . . . and their interest in, and ability to qualify for, such positions."  Consent Decree ¶ 6.  To bring about that goal, the city gave African Americans a hiring preference "on an interim basis to achieve the goal of hiring [African Americans] for 25% of all entry-level firefighter and police officer hires."  *Id.* ¶ 7.

As for women, the consent decree's long-term goal remained simple enough:  "to utilize females in all ranks within the fire and police departments in numbers approximating their interest in and ability to qualify" for those positions.  Consent Decree ¶ 8.  But the parties presented no interim goals in the consent decree, instead leaving those goals to be

negotiated within eighteen months of the decree's entry.[2]  *Id.*  Nevertheless, the consent decree expressed a goal of hiring females for twenty percent of all entry-level police officer hires.  *Id.* ¶ 8(b).

To achieve the long-term goals that were actually established, the consent decree provided Syracuse with three tools:  (1) the capacity to grant hiring priority to African American and female candidates "in a manner analogous, but not identical, to the priority which has been given to [c]ity residents over non-resident applicants";[3]  (2) the obligation on New York's part to provide civil service examinations which accurately measure job performance; and (3) the ability of any party to request additional relief if the civil service examinations are found to inaccurately measure job performance.  Consent Decree ¶ 1.  The city also agreed to supplement its recruiting program to target and attract "qualified [African American] and female applicants . . . ."  *Id.* ¶ 4(d).

By the plain terms of the consent decree, any party was permitted to move for its dissolution five years after it was entered.  Consent Decree ¶ 18.  However, the consent decree specifically noted that a motion to dissolve it should consider "whether the parties ha[d] substantially complied" with the decree and whether its "basic objectives" had been met.  *Id.*

On March 27, 1980, the Court formally approved the consent decree.  Decree Order 17.  After the decree was approved,  Syracuse began to maintain at least two lists of eligible candidates:  a "general list" and a list of African American candidates.  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 101-02 (2d Cir. 2010) (describing the city's hiring

---

[2] According to the city, that negotiation was never completed and to the Court's knowledge the issue was never resolved.  Dkt. 49-8, p. 4.

[3] The consent decree itself makes no mention of a potential hiring preference for female applicants, but an October 10, 1980 court order on Syracuse's motion clarified the consent order to permit females to also receive a hiring preference.  Dkt. 49-4, ¶ i.

procedures in response to challenge by rejected white male firefighter applicants).  It is unclear whether the city maintains a third list for females who took the civil service exam, but its submissions seem to indicate that it does.

At any rate, according to Syracuse, its preference regime has resulted in demographic breakdowns for the police department as follows:  10.32% of all police officers are African American while 17.40% of all officers are female; 1.92% of all police sergeants are African American while 5.77% are female; no lieutenants are African American although 15% are female; no captains are either African American or female; and 20% of all police chiefs are African American, although none are female.

As for the demographics of the fire department, Syracuse claims the following:  22.8% of all firefighters are African American while 4.7% are female; 4.6% of fire lieutenants are African American while 1.5% are female; 10% of all fire captains are African American while none are female; and 13.6% of all fire chiefs are African American while 4.5% are female.

By contrast, the most recent data available estimates that African Americans make up 27.9% of Syracuse's labor force, and women make up 52.8%.

According to the government, in April of 2019, New York's Civil Service Commission administered a new entry-level firefighter examination.  In September of 2019, the commission similarly issued a new entry-level police officer examination.  The government contends that these new examinations eliminate the need for the ongoing hiring preferences, and developments in federal and constitutional law have rendered the manner in which the city employs those preferences untenable.  The government thus moved under Rule 60(b)(5) to modify the consent decree to strip it of the racial and sex-based preferences now and allow the consent decree to dissolve altogether once the new tests have been properly

administered.  Dkt. 49.  The State of New York joined the government's motion.  Dkt. 60.  But Syracuse opposed, arguing that the consent decree should remain in force.  Dkt. 61.

### III.    LEGAL STANDARD

The Supreme Court has used Rule 60(b) as a lens to consider modifications or dissolutions of institutional reform consent decrees.  *See Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 383 (1992).  As relevant to this case, Rule 60(b)(5) allows a party to move for relief from "a final judgment, order, or proceeding" where "the judgment has been satisfied, released, or discharged[,] . . . or applying it prospectively is no longer equitable[.]"  The party seeking relief bears the burden of demonstrating that the purposes of the underlying litigation have been achieved.  *Horne v. Flores*, 557 U.S. 433, 447 (2009).

Deciding a motion to dissolve a consent decree created to foster institutional reform requires "a flexible standard" hinging on either "changed circumstances or substantial attainment of the decree's objective."[4]  *Patterson v. Newspaper & Mail Deliverers' Union*, 13 F.3d 33, 38 (2d Cir. 1993).  This flexibility "entitles a court of equity to focus on the dominant objective of the decree and to terminate the entire decree once that objective has been reached."  *Id.* at 39.

As for the changing legal circumstances inquiry, "[i]t is possible that a decree that appeared to meet the relevant constitutional standards as understood in 1980 may fail to satisfy . . . precedent that has developed since entry of such a decree but that could well apply retroactively."  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 109-10 (2010) (Livingston, J., concurring) (citing *Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 97 (1993)).  As such, courts

---

[4] The consent decree itself requires consideration of whether its goals have been met.  Consent Decree ¶ 18.  However, neither party has argued that the consent decree's own terms could interfere with its dissolution or modification if some of its provisions violate the law, and thus the Court will consider the government's arguments that a change in law has rendered the consent decree unlawful regardless of whether the consent decree's objectives have been met.

are charged with ensuring that the consent decree does not come to exceed its appropriate limits.  *Horne*, 557 U.S. at 450.  A decree exceeds its limits if it is aimed at "eliminating a condition that does not violate federal law" or if it "does not flow from such a violation."  *Id.* (cleaned up) (citing *Milliken v. Bradley*, 433 U.S. 267, 282 (1977)).

Courts have also been cautioned that if a consent decree is "not limited to reasonable and necessary implementations of federal law, it may improperly deprive future officials of their designated legislative and executive powers."  *Horne*, 557 U.S. at 450 (internal citations and quotation marks omitted).  In sum, a consent decree may be modified or dissolved if a significant change in factual conditions or in law renders its continued enforcement "detrimental to the public interest."  *Id.* at 447.

## IV.   **DISCUSSION**

To prevail on its motion, the government must prove one of three events has occurred: (1) the parties have substantially fulfilled the consent decree's purpose; (2) a change in factual circumstances; or (3) a change in the governing law.  *Patterson*, 13 F.3d at 38.  The government argues that it has proven both substantial fulfillment and a change in the governing law.  Specifically, it argues that:  (1) the new civil service examination substantially fulfills the consent decree's purpose; (2) the 1991 Amendment to Title VII has made Syracuse's use of separate eligibility lists unlawful; (3) the use of separate eligibility lists for African Americans cannot survive strict scrutiny as required by subsequent caselaw; and (4) the use of separate eligibility lists for women cannot survive intermediate scrutiny.

However, even if the government proves that a change in the governing law or factual circumstances merits their requested relief, they must also demonstrate that the modifications they request to the consent decree are suitably tailored to the change they have proven.  *Rufo*, 502 U.S. at 391.

9

## A. **Timeliness.**

"A motion under Rule 60(b) must be made within a reasonable time[.]"  Fed. R. Civ. P. 60(c)(1).  In considering the timeliness of a Rule 60(b) motion, courts in the Second Circuit "scrutinize the particular circumstances of the case[ ] and balance the interest in finality with the reasons for delay."  *PRC Harris, Inc. v. Boeing Co.*, 700 F.2d 894, 897 (2d Cir. 1983) (applying reasonable time standard for Rule 60(b)(6) motion).  "In a typical case, five years from the judgment to a Rule 60(b) motion would be considered too long by many courts." *Grace v. Bank Leumi Tr. Co.*, 443 F.3d 180, 191 (2d Cir. 2006).

Syracuse does not challenge the timeliness of the government's motion to the extent that the government argues that the substantial objectives of the consent decree have been met.  Rather, the city argues that the government waited too long to make its arguments relying on changes in the law.  In particular, the city points out that the Title VII amendment upon which the government relies was enacted in 1991.  Moreover, *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989), the Supreme Court precedent which the government alternatively argues presents a change in legal circumstances, is even older, having been decided in 1989.

Syracuse is correct that, in a vacuum, twenty-nine years is not a reasonable time in which to file a Rule 60(b)(5) motion.  *See Grace*, 443 F.3d at 191 (noting that five years is typically too long to merit relief).  But the government objects to the city's framing of the question.  Instead, according to the government, the city violates federal law every hiring cycle in which the city uses its hiring preferences and eligibility lists.  By the government's logic, every year the clock should begin anew, and it was not unduly delayed in acting because within the past year the city has once again violated federal law.

Although Syracuse is correct that the government's delay is both extensive and without excuse, nevertheless in the unique circumstances of a consent decree that delay is not enough to command the Court to turn a deaf ear to the government's arguments.  The interest in finality—the foundational interest in Rule 60(b)(5)'s time limitations—is nonexistent in a case like this one.  *PRC Harris*, 700 F.2d at 897.  In fact, the consent decree is itself an ongoing remedy that precludes finality as long as it endures.  As such, all parties agree that at some point the consent decree should end, and until it does the case will not be final in any sense of the word.

Against the miniscule interest in finality at issue, the particular circumstances of this case make a compelling argument for allowing the government's motion to proceed.  Regardless of when the motion could or even should have been brought, the consent decree rests on this Court's authority.  It is thus the Court's responsibility to ensure that authority is not extended beyond its lawful bounds.   Against that paramount concern, the nonexistent finality interest and the government's less than compelling justifications for its delay count for little.  *PRC Harris*, 700 F.2d at 897.  Accordingly, the Court will consider the government's motion despite its extensive delay.

### B. <u>Fulfillment of the Consent Decree's Purpose.</u>

Both parties attempt to shape the purpose of the consent decree to suit their own objectives.  To hear the government tell it, the consent decree's purpose is to prevent African Americans and women from being "disadvantaged by reason of race or sex in their employment as police officers or firefighters."  Consent Decree p. 8.  The government acknowledges that the consent decree's purpose includes certain hiring objectives, but downplays them by noting that the consent decree only tasks Syracuse with "making reasonable efforts" to meet those hiring goals.  *Id.*

11

Thus, the government's argument is that the new civil service exam eliminates disadvantage on the basis of race and sex.  Moreover, it alleges Syracuse has made a reasonable effort to meet its hiring objectives by averaging African-American hiring rates of 25% and 15% in its fire and police departments, respectively, and female hiring rates of 18% in its police department since 2005.

As Syracuse correctly points out, the government is ignoring language in the consent decree tying its hoped-for employment rates for African Americans and women to the labor force rates for those demographics in the city.  Consent Decree ¶¶ 6, 8(a).  Similarly, the city points out that the consent decree notes that women and African Americans should be proportionately included "in all ranks," not simply entry-level positions.  *Id.*

Through that lens, it is not difficult to see why Syracuse would object to an argument that the consent decree's objectives have been met.  There are several ranks—particularly among the middle and upper echelons of the police and fire departments—that still have minimal representation of either women or African Americans.  Those relative vacancies make it a stretch to argue that African Americans and women are proportionately included in "all ranks."  Even setting the "all ranks" language aside, the proportions of African American and female employment among the police and fire departments are at no stage equal to those groups' proportions of the labor force.  As a result, the city contends that the goals of the consent decree have in no way been met.

However, even Syracuse's argument ignores that the language of the consent decree—and the Second Circuit's interpretation of that language—provides a caveat to the proportionality language.  Specifically, the long-term goal of the consent decree is properly framed as employing African Americans and women "in numbers approximating their representation within the labor force which is available for employment in the [c]ity . . . *and*

*their interest in, and ability to qualify for, such positions*."  *Vivenzio*, 611 F.3d at 107 (emphasis added); *see also* Consent Decree ¶¶ 6, 8(a).

But although neither party accurately grapples with the consent decree's goal, Syracuse does not bear the burden of proof on the government's Rule 60(b)(5) motion:  the government does.  *Horne*, 557 U.S. at 447.  If the city's factual showing misses the mark by failing to account for the possibility of a disproportionate lack of interest in police and fire work by either African Americans or women, the government's showing aims at entirely the wrong target.

The government provides no facts or data to support the conclusion that African Americans and women are employed by the police and fire departments in numbers that approximate their proportions in the labor market and their interest in and ability to qualify for those positions.  Moreover, the government has provided no evidence that its new civil service examination is truly race-neutral.  Accordingly, though it may be the case that the new examinations will alleviate the need for the consent decree in the future, the government has not provided any proof that those examinations accomplish that goal today.  The government has therefore failed to prove that the substantial objectives of the consent decree have been met, and it is not entitled to relief on that basis.[5]

**C. <u>Change in the Law.</u>**

The government points to three potential changes in the law that it contends open the door for it to dissolve the consent order:  (1) the 1991 Amendment to Title VII; (2) the application of strict scrutiny to race-based affirmative action in *City of Richmond v. J.A.*

---

[5] The government has also not argued that a change in factual circumstances has undermined the consent decree's ongoing necessity.  To whatever extent the government may have argued that the new civil service examination constitutes a change in the factual circumstances surrounding the consent decree, the government has once again provided no evidence that those circumstances have truly changed.  Accordingly, the government would merit no relief on the third prong of Rule 60(b)(5) in any case.

*Croson Co.*, 488 U.S. 469 (1989); and (3) the application of intermediate scrutiny to gender discrimination.  For its part, Syracuse argues that:  (1) the government should be judicially estopped from arguing that the consent decree is unlawful; (2) the government is not challenging the consent decree itself, but rather the city's application of the consent decree; and (3) the consent decree as applied survives both strict and intermediate scrutiny.

    **1.  <u>Judicial Estoppel.</u>**

    Judicial estoppel potentially comes into play when a litigant:  (1) "took a prior inconsistent position"; and (2) "convinced an earlier tribunal to adopt that position . . . ."  *Clark v. All Acquisition, LLC*, 886 F.3d 261, 266 (2d Cir. 2018).  Even if both of those conditions are met, "[b]efore judicially estopping a litigant, a court must inquire into whether the particular circumstances of a case 'tip the balance of equities in favor' of doing so."  *Id.* at 266-67 (citing *New Hampshire v. Maine*, 532 U.S. 742, 751 (2001)).

    One crucial equitable factor is whether the litigant's prior inconsistent position would provide it an unfair advantage against the party seeking estoppel.  *Clark*, 886 F.3d at 267.  However, even in circumstances where the litigant's prior position had only a *de minimis* effect, judicial estoppel may nevertheless be employed in unusual circumstances "to safeguard the integrity of the courts . . . ."  *Id.* at 268.

    Syracuse argues that because the government argued in favor of maintaining the consent decree when the decree was challenged by white male applicants rejected by the fire department, it should be judicially estopped from arguing in favor of removing the consent decree now.  *Cf. Vivenzio v. City of Syracuse*, 05-CV-0531, Dkt. 170.  But as the government correctly notes, the government's position was only that "there exist genuine issues of material fact" regarding whether the goals of the consent decree had been met, and that it was still evaluating the ongoing viability of the consent decree.  *Id.* at 5.

14

Accordingly, the government's prior position was far too equivocal to even be inconsistent with its present litigative stance.  After all, it never said that the consent decree was constitutional, or that the goals of the consent decree had not yet been met. *Vivenzio*, 05-CV-0531, Dkt. 170, at 5.   Those issues aside, applying judicial estoppel would raise problems as to how the consent decree could ever end, because the city would be similarly estopped if it ever were to try to end the consent decree.  After all, the city's position in the current motion practice that the consent decree should not be dissolved would mean that the city itself would be subject to judicial estoppel by its own arguments.

In other words, finding that judicial estoppel applied in this circumstance would only permit the consent decree to ever be dissolved if all parties agreed that it should be.  If either Syracuse or the government disagreed with a future motion to modify or dissolve the consent decree from its counterpart, it could simply raise judicial estoppel to preclude the other party from prevailing on its motion.  By extension, far from safeguarding this Court's integrity, *Clark*, 886 F.3d at 268, imposing judicial estoppel would create a loophole stymying the resolution of this case.  Therefore, judicial estoppel cannot apply to the present facts.

   2. **1991 Title VII Amendment.**

In 1991, Congress made it unlawful under Title VII for employers "in connection with the selection or referral of applicants or candidates for employment[,] . . . to adjust the scores of, use different cutoff scores for, or otherwise alter the results of, employment[-]related tests on the basis of race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(*l*).

The government argues that Syracuse violates Title VII by using different cutoff scores for the civil service examination in the form of separate lists of African American and female candidates such that a score that merits consideration for a member of those groups would not merit consideration for a non-African American male.

In forty-five pages of briefing and at oral argument, Syracuse has not argued at any point that its use of separate eligibility lists for African Americans and women is not violative of Title VII.  Instead, the city accuses the government of a "bait and switch" argument by pointing out that technically its practice of maintaining separate hiring lists is not explicitly provided for in the consent decree and that therefore there is no need to modify the consent decree based on Title VII.

In other words, Syracuse describes the government's motion as an "as applied" challenge to the consent decree and claims that a Rule 60(b)(5) motion should be reserved for a challenge to the viability of the consent decree itself.  *See Flores v. Lynch*, 828 F.3d 898, 909-10 (9th Cir. 2016) ("When the basis for modification is a change in law, the moving party must establish that the provision it seeks to modify has become 'impermissible.'").

However, it is Syracuse engaging in a "bait and switch" tactic by venturing into the realm of as-applied and facial challenges—which are two varieties of constitutional challenges to statutes and regulations—to grapple with modifying a consent decree.  *See, e.g.*, *Copeland v. Vance*, 893 F.3d 101, 110 (2d Cir. 2018) (discussing as-applied challenges in context of statute being unnecessarily vague).  Unlike a statute or regulation, a consent decree operates as both a judicial order and a contract.  *E.E.O.C. v. N.Y. Times Co.*, 196 F.3d 72, 78 (2d Cir. 1999).  And of course, the Court cannot enforce a consent decree in such a way as to allow the city to violate the law.  *See, e.g.*, *Anabas Export Ltd. v. Alper Indus. Inc.*, 603 F. Supp. 1275, 1276 (S.D.N.Y. 1985) ("A party to an illegal contract cannot ask a court of law to help him carry out his illegal object[.]" (cleaned up)).  The city's first argument must therefore be rejected.

Syracuse's second argument, that the Court is obligated to consider only the text of the consent decree in considering modification, fares no better.  It is true, as the city argues,

that a consent decree should be read and applied "within its four corners" in establishing a party's purposes. *E.E.O.C.*, 196 F.3d at 78 (internal citations and quotation marks omitted).

But the "four corners" doctrine that Syracuse alludes to did not arise in the context of modification.   Rather, that doctrine only serves to limit the capacity of a court to impose further duties on a party to a consent decree beyond what the consent decree specifically provides for. *See E.E.O.C.*, 196 F.3d at 78-79 (discussing four corners doctrine in determining whether consent decree invalidated prior contracts).   The government is not trying to impose additional duties on the city.   Instead, the government is seeking to modify the consent decree to remove the duties that presently exist.   The city's reliance on the four corners doctrine is thus misplaced.

Syracuse next cites the Ninth Circuit's decision in *Flores v. Lynch* for the proposition that "[w]hen the basis for modification [of a consent decree] is a change in law, the moving party must establish that the provision it seeks to modify has become 'impermissible.'"  828 F.3d at 909-10 (citing *Rufo*, 502 U.S. at 388).   The city's reliance on the Ninth Circuit is similarly insufficient to win it the day.

At the outset, as an opinion from outside the Second Circuit, *Lynch* only carries persuasive weight.   Of course, if the Ninth Circuit was merely restating the rule in *Rufo*, this Court would nevertheless be bound by the Supreme Court.   However, *Lynch* appears to actively expand *Rufo*'s opinion, rather than merely restating it.   Specifically, there are to this Court's eye two meaningful leaps separating *Lynch* from *Rufo*.

First, *Rufo* illustrates a circumstance in which a court is required to modify a consent decree.   502 U.S. at 388 (ruling that a "consent decree must . . . be modified" if contrary to law).   But *Lynch* translates that description of a circumstance in which a district court has no choice but to act into a part of the movant's burden, despite there being no indication that the

Supreme Court intended that outcome. 828 F.3d at 909-10 (ruling that "the moving party must establish that the provision it seeks to modify has become 'impermissible'"). *Lynch* thus converts a sufficient condition for a consent decree's modification into a necessary one. *Id.*

Second, *Rufo* only required one of the obligations imposed by a consent decree to be unlawful for modification to be merited. 502 U.S. at 388. It makes no mention of specific textual provisions of the consent decree. *See id. Lynch*'s holding that the provisions of the consent decree must be unlawful themselves thus appears to also extend beyond *Rufo*'s actual holding. *Lynch*, 828 F.3d at 909-10. Thus, *Lynch* is an expansion of *Rufo* rather than a restatement, and though that expansion is of course binding on the Ninth Circuit, its value to the present question is therefore solely persuasive.

Upon careful consideration, this Court is not persuaded to follow *Lynch*. If a consent decree's language is so broad as to permit conduct that violates federal law, practicality demands that courts be permitted to modify that language. Even if the consent decree does not expressly order that conduct, it allows for it, and by extension protects it. This Court has an interest and an obligation to ensure that conduct in violation of federal law is not being perpetrated under its authority.

Indeed, it would be a bizarre outcome if a party to a consent decree could act outside that consent decree's bounds yet still receive the consent decree's protection in performing an unlawful act. That exact outcome would follow in this case if the court were to side with Syracuse and deny the government's motion on the basis that it does not challenge the text of the consent decree. The city has used the consent decree to shield itself from liability for its use of disparate eligibility lists in the past. *See Vivenzio*, 611 F.3d at 107-08 (discussing whether this consent decree's goals had been met as necessary to determine whether plaintiff's race discrimination claims could survive summary judgment or were foreclosed by

consent decree).  Allowing the city's argument to succeed would raise questions about how its use of separate lists could be challenged at all.

In other words, as Syracuse would have it, it is impervious to outside suit for its use of separate hiring lists for women and African Americans because the consent decree protects it.  At the same time, the consent decree does not explicitly provide for the use of separate eligibility lists, and thus the consent decree cannot be modified to disallow those lists because that practice exists beyond the four corners of the consent decree.  This result, perfectly insulating potentially unlawful conduct from judicial review at either end, cannot stand.  But that result also seems to be a necessary one if the Ninth Circuit's logic in *Lynch* is taken to its inevitable end.  *Lynch*, 828 F.3d at 909-10.  That decision is therefore, respectfully, unpersuasive, and this Court finds that whether the consent decree expressly provided for the disparate eligibility lists is not a dispositive question.

Instead, the more pertinent question is not whether the use of separate eligibility lists is explicitly mandated and allowed for by the consent decree, as Syracuse argues, but instead whether the consent decree is the source of the city's authority to use those lists.  If the consent decree is the source of the city's authority to use the separate eligibility lists, then the consent decree may be modified to withdraw that authority if that practice is unlawful.  Conversely, if the consent decree did not convey to the city the authority to use separate eligibility lists, then it should be open to lawsuits challenging the validity of that practice.

Syracuse cannot reasonably dispute that its authority to use the separate hiring lists, to the extent that it exists, stems entirely from the consent decree, because it is the consent decree alone that empowers the city to engage in hiring preferences despite § 61's requirement that it hire from the three highest-scoring applicants.  Consent Decree ¶ 7

19

(authorizing the city to use hiring preferences for African Americans), Dkt. 49-4, ¶ i (authorizing same for women).

Accordingly, the only question that remains is whether the 1991 amendment to Title VII makes Syracuse's use of separate eligibility lists for African Americans and women unlawful.  Given the city's silence on that subject despite its arguments as to the constitutionality of the eligibility lists, the prospects of the current regime's legality are dim indeed.  It can hardly be disputed that the separate eligibility lists use different cutoff scores, and therefore violate the 1991 amendment, because their purpose is to ensure that an African American or female candidate who would not otherwise have scored within the top three eligible applicants for a position would still be hirable.  In other words, a non-African American male's score for consideration needs to fall within the top three, but an African American or female's score need not.  42 U.S.C. § 2000e-2(*l*).

As a result, the use of separate eligibility lists in the context in which Syracuse uses them is prohibited by Title VII, and the government has successfully proven that a change in legal circumstances merits a modification to the consent decree.[6]

D.  **Suitable Tailoring of the Government's Proposed Modifications.**

However, as Syracuse correctly notes, even if a change in circumstances merits a modification to a consent decree, that modification must be "suitably tailored to the changed circumstance."  *Rufo*, 502 U.S. at 391.  A modification is not suitably tailored if it:  (1) creates or perpetuates a constitutional violation; (2) rewrites a consent decree "so that it conforms to the constitutional floor"; or (3) considers provisions of the consent decree outside of those actually challenged by the moving party.  *Id.* at 391-92.

---

[6] Because the Court finds that the city's use of separate eligibility lists for African Americans and women violates Title VII, it need not assess the constitutionality of that practice.

Syracuse argues that the government's requested relief of abolishing the consent decree as a whole is not suitably tailored, and the government has not provided any guidance on more appropriate tailoring.  For its part, the government argues that if the city's hiring preferences are abolished, all that is left is the requirement for the government to institute a new civil service examination, which it has already done.  Accordingly, the government contends that no tailoring is possible because the consent decree's efficacy will have ended.

But the government is incorrect.  Simply finding that the use of separate eligibility lists—the only practice the government actually challenges—violates Title VII does not invalidate any alternative possibility of hiring preferences for the disadvantaged groups at issue in this case.

At any rate, the consent decree allows for "additional relief in the event it is determined that the examinations or other job criteria do not accurately measure potential job performance and have an adverse impact on [African American] and/or female applicants . . . ."  Consent Decree ¶ 1(c).  As discussed above, the government has as of yet failed to prove that the new examination will not disadvantage those groups, and thus maintaining this mechanism for additional relief is of paramount importance.  Thus, the government has not provided a suitably tailored means of modifying the consent decree.

As a result, Syracuse advocates that the government's motion should simply be denied.  On that second point, the city overplays its hand.  Because the Court has found that the consent decree's authorization of the city's use of separate eligibility lists for African Americans, women, and all other candidates is violative of the 1991 amendment to Title VII, that authorization cannot continue.  Instead, the responsibility falls upon the Court to craft  a remedy that will protect the lawfulness of its orders while allowing the as-yet-unfulfilled purposes of the consent decree to proceed onward.

21

On that note, Syracuse correctly points out that there is still much work to be done in achieving the goals of the consent decree.  The city also argues that different standards apply to a modification of a consent decree than to a direct challenge to the city's practice of using separate eligibility lists, and that it may have mustered a more vigorous defense of the separate lists if it were faced with such a challenge.  Both points call for a light touch.

The Court thus sees no reason to dispose of Syracuse's capacity to institute a hiring preference, or even to mandate that the city cease using the separate eligibility lists.  Instead, the Court's desire to prevent the unlawful use of its authority is satisfied by withdrawing the consent decree's capacity to shield the city from lawsuits brought to challenge its application of different cutoff scores for the civil service examination on the basis of race and gender.

Accordingly, Paragraph 1(a)  of the consent decree is modified to read as follows:

The City shall have the right, to the extent necessary to meet its obligations and goals under this decree, to grant priority to African Americans and females who have successfully passed the applicable civil service examinations, which preference will operate in a matter analogous, but not identical, to the priority which has been given to City residents over non-resident applicants (as more particularly set forth in paragraph 7).  Nothing in this consent decree, including the allowances of hiring preferences in this Paragraph, Paragraph 7, and Paragraph 8(b), shall be construed as insulating the City from a civil suit for applying differing cutoff scores for the civil service examination on the basis of race or gender, including for African American and female applicants.

As a result, Syracuse may continue to institute hiring preferences, and indeed may even continue to maintain separate eligibility lists for African Americans and women.  But should it do so, it must be ready to defend those eligibility lists on their merits without the consent decree's protection.  The Court is satisfied that this modification will allow the city to continue to strive to improve diversity while addressing the Court's own concerns that its authority would otherwise be used to shelter unlawful conduct.  In all other respects, the consent decree must remain in force.

22

**V.    CONCLUSION**

Syracuse's goal throughout this litigation is an admirable one.  Its dedication to combating racial and sex discrimination within its police and fire departments even after forty years of effort is worthy of commendation.  The work of remedying the city's past discriminatory hiring practices is far from over, and contrary to the government's arguments, the Court will not deprive the city of its tools for continuing in its labors.  However, the government has made an adequate showing that the city's practice of using separate eligibility lists for women and African American candidates for police and fire work, a practice empowered by the consent decree, violates Title VII.  The Court cannot allow its authority to be used to circumvent federal law, and accordingly the government's motion to modify the consent decree must be granted in part.

Therefore, it is

ORDERED THAT

1.  The government's Motion to Modify the Consent Decree under Rule 60(b)(5) is GRANTED IN PART;

2.  Paragraph 1(a) of the consent decree shall now read:

    The City shall have the right, to the extent necessary to meet its obligations and goals under this decree, to grant priority to African Americans and females who have successfully passed the applicable civil service examinations, which preference will operate in a matter analogous, but not identical, to the priority which has been given to City residents over non-resident applicants (as more particularly set forth in paragraph 7). Nothing in this consent decree, including the allowances of hiring preferences in this Paragraph, Paragraph 7, and Paragraph 8(b), shall be construed as insulating the City from a civil suit for applying differing cutoff scores for the civil service examination on the basis of race or gender, including for African American and female applicants.

3.  The government's motion is DENIED in all other respects.

IT IS SO ORDERED.

Dated:  January 12, 2021
        Utica, New York.

David N. Hurd
U.S. District Judge