UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

LEE ALEXANDER, as Mayor of the City
of Syracuse, THOMAS F. HANLON, as
Chief of Fire of the City of Syracuse Fire
Department, THOMAS J. SARDINO, as
Chief of Police of the Syracuse Police
Department, and CITY OF SYRACUSE,

        Plaintiffs,

NATIONAL ASSOCIATION FOR
THE ADVANCEMENT OF COLORED
PEOPLE, Syracuse/Onondaga Chapter,

        Intervenor-Plaintiff,

    -v-                        5:78-CV-392 (DNH) (LEAD)

VICTOR S. BAHOU, President of the
Civil Service Commission of the State
of New York, JOSEPHINE L. GAMBINO,
as Commissioner of and constituting, the
Civil Service Commission of the State of
New York, JAMES T. MCFARLAND, as
Commissioner and constituting, the
Civil Service Commission of the State of
New York, and EDWARD J. GUSTY,
Commissioner of the Department of
Personnel of Onondaga County,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

        Plaintiff,

NATIONAL ASSOCIATION FOR
THE ADVANCEMENT OF COLORED
PEOPLE, Syracuse/Onondaga Chapter,

        Intervenor-Plaintiff,

    -v-                       5:80-CV-53 (DNH) (MEMBER)

CITY OF SYRACUSE, a municipal
corporation, LEE ALEXANDER, Mayor
of the City of Syracuse, THOMAS F.
HANLON, Fire Chief, City of Syracuse
Fire Department, SYRACUSE FIRE
DEPARTMENT, THOMAS J. SARDINO,
Chief of Police, City of Syracuse Police
Department, SYRACUSE POLICE
DEPARTMENT, VICTOR S. BAHOU,
as Commissioner of and constituting
the New York State Municipal Service
Commission, JOSEPHINE L. GAMBINO,
as Commissioner of and constituting the
New York State Civil Service Commission,
JAMES T. MCFARLAND, as Commissioner
of and constituting the New York State
Civil Service Commission, NEW YORK
STATE MUNICIPAL TRAINING COUNCIL,
And EDWARD J. GUSTY, Local Personnel
Officer, County of Onondaga,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:             OF COUNSEL:

HANCOCK ESTABROOK, LLP     JOHN G. POWERS, ESQ.
Attorneys for Lead Plaintiff &      MARY L. D'AGOSTINO, ESQ.
   Consolidated Defendants
1800 AXA Tower I
100 Madison Street
Syracuse, NY 13202

- 2 -

U.S. DEPARTMENT OF JUSTICE          AN HOANG, ESQ.
Attorneys for Consolidated Plaintiff     JOHN P. BUCHKO, ESQ.
950 Pennsylvania Avenue, NW
CRT/ELS/PHB – Room 4018
Washington, DC 20530


MCDERMOTT WILL                      FRANK OLANDER, ESQ.
   & SCHULTE, LLP
Attorneys for Intervenor Plaintiff
919 Third Avenue
New York, NY 10022


HON. LETITIA JAMES                  WILLIAM A. SCOTT, ESQ.
New York State Attorney General
Attorneys for State Defendants
The Capitol
Albany, NY 12224


DAVID N. HURD
United States District Judge


## DECISION & ORDER

## I.      INTRODUCTION

On September 5, 2025, the United States of America (the "Government")

moved to dissolve a consent decree that has governed hiring practices within

the police and fire departments of the City of Syracuse (the "City") for more

than four decades.

The consent decree arose from two civil actions filed in 1978 and 1980

challenging hiring practices that allegedly produced unlawful racial and sex-

based disparities in municipal employment.  Those actions were consolidated

before U.S. District Judge Howard G. Munson and culminated in a negotiated

settlement and the entry of a consent decree (the "consent decree" or the "decree") designed to remedy the effects of past discrimination and increase opportunities for African-Americans and women seeking employment in the City's police and fire departments.

The consent decree had the effect of permitting the City to institute a hiring preference for African-American and women candidates notwithstanding New York State's civil service hiring requirement. The decree has remained in effect under the supervision of this Court, which took over the matter following Judge Munson's death.

The Government has periodically sought modification of the consent decree's terms. In 2020, the Government moved under Rule 60(b)(5) to partially dissolve and modify the decree, arguing that newly developed civil-service examinations and intervening legal developments rendered portions of the decree unnecessary or unlawful.

The City opposed the Government's bid for partial dissolution or modification. After briefing and argument, the Court granted that motion in limited part, modifying the consent decree's authorization of separate eligibility lists while otherwise declining to dissolve the decree. *Alexander v. Bahou*, ("*Alexander II*"), 512 F. Supp. 3d 363, 378–79 (N.D.N.Y. 2021).

The Government has returned to this Court seeking further relief under Rule 60(b)(5), arguing that subsequent developments in constitutional and

employment-discrimination law make continued enforcement of the consent decree inequitable. Dkt. No. 77. The Government principally argues that intervening developments in Title VII and Equal Protection jurisprudence have undermined the legal foundation of the decree and require its dissolution.

The City and intervenor-plaintiff the National Association for the Advancement of Colored People ("NAACP") oppose the motion. Dkt. Nos. 97, 104. Together, they contend that the governing legal standards for remedial employment measures remain intact and that the consent decree continues to serve important remedial purposes. According to the City and the NAACP, the Government has failed to demonstrate the significant change in law or fact necessary to justify dissolution of the decree under Rule 60(b)(5).

The motion has been fully briefed, Dkt. Nos. 97, 104, 109, 112, and will be decided on the basis of the submissions without oral argument.

## II.   **BACKGROUND**

This litigation arises from a series of actions filed in the late 1970s challenging hiring practices within the City of Syracuse Police and Fire Departments. *See* Dkt. No. 1; Dkt. No. 12 ("Decree Order"), at 3–4; *see also Alexander II*, 512 F. Supp. 3d 363, 367–69 (N.D.N.Y. 2021). First, in 1978, City officials filed a legal challenge alleging that New York's civil-service hiring framework—particularly the so-called "rule of three," now codified at New York Civil

Service Law § 61—restricted the City's ability to address significant racial and sex-based disparities in municipal employment.  *See id.*

Under § 61, civil service appointments generally were required to be made from among the three highest-scoring candidates on an eligible civil-service list.  *See* Decree Order at 2–3.  The City argued that strict adherence to that requirement, when coupled with examination results that disproportionately favored white male applicants, frustrated its efforts to increase the representation of African-Americans and women within its police and fire departments.  *See id.*  According to the City, continued adherence to those state-law hiring procedures risked perpetuating employment practices with discriminatory effects.  *Id.*

Second, in 1980, while the City's action remained pending, the Government commenced a separate suit under Title VII of the Civil Rights Act of 1964 alleging that the City, the State, and relevant state agencies were engaged in certain discriminatory hiring practices.  *See* Decree Order at 4; *Alexander II*, 512 F. Supp. 3d at 368.

The parties ultimately resolved both actions through a negotiated settlement that was incorporated into a consent decree approved by Judge Munson on March 27, 1980.  *See* Decree Order.  The consent decree was designed to remedy the effects of past discrimination and to increase the representation of

African-Americans and women within the City's police and fire departments. *See* Dkt. No. 49-3 ("Consent Decree").

To that end, the consent decree established long-term workforce objectives, required enhanced recruitment efforts directed toward underrepresented groups, and authorized the City to employ race- and sex-conscious hiring measures notwithstanding certain constraints imposed by state civil-service law. *See id.*

The consent decree's central remedial objective was to increase the representation of African-Americans and women within the City's police and fire departments to levels "approximating their presence in the relevant labor force and their interest in, and ability to qualify for, those positions." Consent Decree ¶¶ 6, 8.

The consent decree authorized the City to employ interim hiring preferences, including a goal that African-Americans comprise twenty-five percent of entry-level firefighter and police officer hires and that women comprise twenty percent of entry-level police officer hires. *Id.* ¶¶ 7, 8(b). Although the consent decree provided that any party could seek its dissolution after five years, it expressly contemplated that termination would depend upon whether the parties had "substantially complied" with its terms and whether its "basic objectives" had been achieved. Consent Decree ¶ 18.

Over the ensuing decades, the consent decree remained in effect and continued to govern hiring practices within the City's police and fire departments. During that period, the City implemented hiring procedures intended to advance the decree's objectives and periodically reported demographic data concerning departmental composition. For example, the City began to maintain at least two lists of eligible candidates: a "general list" and a list of African-American candidates. *See Vivenzio v. City of Syracuse*, ("*Vivenzio II*"), 611 F.3d 98, 101–02 (2d Cir. 2010); *Alexander II*, 512 F. Supp. 3d at 369.

In 2005, several unsuccessful firefighter applicants challenged the City's use of race-conscious hiring procedures implemented pursuant to the Consent Decree. Those applicants filed a civil action alleging violations of the Equal Protection Clause, Title VII, and other federal and state laws. *Vivenzio v. City of Syracuse* (*"Vivenzio I"*), 545 F. Supp. 2d 241, 245–48 (N.D.N.Y. 2008). The City defended its hiring practices on the grounds that it was complying with the consent decree and that the decree's remedial objectives had not yet been achieved. *See id.* at 251.

This Court granted summary judgment in favor of the City, concluding that the plaintiffs had failed to establish that the consent decree's objectives had been satisfied. *Vivenzio I*, 545 F. Supp. 2d. at 252. On appeal, however, the Second Circuit vacated and remanded for further proceedings, holding that the existing record lacked sufficient evidence concerning the relevant labor

pool to determine whether the consent decree's goals had been met. *Vivenzio II*, 611 F.3d at 108–09.

Although the panel did not decide the consent decree's underlying constitutionality, a two-judge concurrence questioned whether a decree that was constitutional when entered necessarily remained constitutional decades later in light of developments in affirmative action jurisprudence. *See Vivenzio II*, 611 F.3d at 110 (Livingston, J., joined by Vitaliano, J., sitting by designation, concurring and noting that "[b]oth the Supreme Court and the Courts of Appeals have pronounced repeatedly on the subject of strict scrutiny in the context of voluntary affirmative action plans in the 30 years since the [c]onsent [d]ecree here was entered").

Those questions were left unanswered. Following remand, the parties settled the litigation in 2012. Later, in September 2020, the Government moved under Rule 60(b)(5) to modify and partially dissolve the consent decree. *See* Dkt. No. 49-1 ("Mot. for Partial Dissolution"). The Government argued that newly developed entry-level examinations for firefighter and police officer positions had eliminated the testing concerns that originally gave rise to the decree and that the decree's "basic objectives" had largely been achieved. *Id.* at 16–19. According to the Government, certain race- and sex-conscious hiring mechanisms authorized by the decree—particularly the maintenance of separate eligibility lists—could no longer be reconciled with Title VII and

contemporary equal-protection principles. *Id.* at 19–25. The City opposed the Government's efforts. Dkt. No. 61.

In January 2021, this Court granted the Government's motion, but only in part. *See Alexander II*, 512 F. Supp. 3d 363. At that time, the Court concluded that the Government had failed to demonstrate that the consent decree's fundamental remedial objectives had been achieved and therefore denied wholesale dissolution of the decree. *Id.* at 372–73. However, the Court determined that the consent decree's authorization of separate eligibility lists was inconsistent with Title VII. *Id.* 376–78

The consent decree was modified accordingly. *Alexander II*, 512 F. Supp. 3d at 376–78 (modifying paragraph 1(a) of the decree to "withdraw[] the consent decree's capacity to shield the city from lawsuits brought to challenge its application of different cutoff scores for the civil service examination on the basis of race and gender."). Apart from that limited modification, the Court declined to disturb the decree's remaining provisions.

## III.   <u>LEGAL STANDARD</u>

Rule 60(b)(5) of the Federal Rules of Civil Procedure allows a party to move for relief from "a [f]inal [j]udgment, [o]rder, or [p]roceeding" where "the judgment has been satisfied, released, or discharged[,] . . . or applying it prospectively is no longer equitable[.]" Fed. R. Civ. P. 60(b)(5).

The Supreme Court has used Rule 60(b) as a lens to consider modifications or dissolutions of institutional reform consent decrees. *See Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 383 (1992). At the same time, Rule 60(b)(5) does not authorize courts to revisit settled judgments merely because a party has come to disagree with them. *See id.*

Rather, the moving party bears the burden of demonstrating "a *significant* change either in factual conditions or in law" that renders continued enforcement of the consent decree inequitable. *Rufo*, 502 U.S. 367 at 384 (emphasis added). Although consent decrees must remain responsive to evolving circumstances, federal courts are not free to terminate them absent the showing required by Rule 60(b). *Horne v. Flores*, 557 U.S. 433, 447 (2009).

Importantly, the question is not whether the consent decree would be negotiated today, nor whether current policymakers would adopt the same remedial measures in the first instance. Rather, the question is whether the Government has met its burden of showing that continued enforcement of the decree is no longer equitable within the meaning of Rule 60(b)(5).

## IV. **DISCUSSION**

To prevail on its motion to dissolve the consent decree, the Government must prove that one of three events has occurred: (1) the parties have substantially attained the consent decree's objectives; (2) there has been a significant change in factual circumstances; or (3) there has been a significant change in

the governing law.  *See Rufo*, 502 U.S. at 369; *see also Patterson v. Newspaper & Mail Deliverers' Union*, 13 F.3d 33, 38 (2d Cir. 1993).

The Government principally contends that there has been a significant change in the governing law.  Specifically, the Government argues that recent Supreme Court decisions have fundamentally altered the legal landscape governing race-conscious governmental action.  *See* Dkt. No. 77-1 ("U.S.'s Br.") at 11–16.

### A.  Significant Change in the Governing Law

The Government may satisfy its burden under Rule 60(b)(5) by demonstrating that intervening developments in controlling law have materially altered the legal framework governing the consent decree.  *Rufo*, 502 U.S. at 384.  "[M]odification of a consent decree may be warranted when the statutory or decisional law has changed to make legal what the decree was designed to prevent."  *Id.* at 388.  A mere "clarification" of the law will not suffice.  *Id.* at 390.

The analysis begins with the unremarkable proposition that a consent decree cannot survive if it requires conduct that federal law no longer permits.  "It is possible that a decree that appeared to meet the relevant constitutional standards as understood in 1980 may fail to satisfy . . . precedent that has developed since entry of such a decree but that could well apply retroactively."

*Alexander II*, 512 F. Supp. 3d at 370 (quoting *Vivenzio*, 611 F.3d 98, 109–10 (2010) (Livingston, J., concurring)).

Nor can a consent decree be enforced in such a way as to permit or require the City to violate the law. *See, e.g., Anabas Export Ltd. v. Alper Indus. Inc.*, 603 F. Supp. 1275, 1276 (S.D.N.Y. 1985) ("A party to an illegal contract cannot ask a court of law to help him carry out his illegal object.") (cleaned up); *see also Rufo*, 502 U.S. at 388 ("A consent decree must of course be modified if, as it later turns out, one or more of the obligations placed upon the parties has become impermissible under federal law.").

Against this general legal backdrop, the Government argues that recent Supreme Court decisions concerning race-conscious decision-making, including *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College* (*"SFFA"*), 600 U.S. 181 (2023), and *Ames v. Ohio Department of Youth Services*, 605 U.S. 303 (2025), among others, have undermined the legal foundations of the decree.

Notably, however, the Government does not argue that any *single* Supreme Court decision expressly invalidates the consent decree. Rather, the Government contends that the cumulative effect of a constellation of recent decisions demonstrates that the Supreme Court has adopted a fundamentally different understanding of federal antidiscrimination law than the one

reflected in *United Steelworkers of America v. Weber*, 443 U.S. 193 (1979), and *Johnson v. Transportation Agency*, 480 U.S. 616 (1987).

The Government cites to *Weber* and *Johnson* as significant because they remain the Supreme Court's principal authorities holding that Title VII does not *categorically* prohibit voluntary race-conscious and sex-conscious employment measures adopted to remedy manifest imbalances in traditionally segregated occupations. *See id.* According to the Government, "[i]n recent years, the Supreme Court returned to a textual understanding of Title VII that erodes *Johnson* and *Weber*." Dkt. No. 109 ("U.S.'s Reply Br.") at 8.

In other words, the Government asks this Court to conclude that *Weber* and *Johnson* have been overruled by implication. Because the consent decree rests in substantial part on the proposition that employers may, in certain limited circumstances, take race and sex into account to remedy demonstrated disparities in employment, the continuing vitality of *Weber* and *Johnson* lies at the center of the Government's motion. *See United States v. Brennan*, 650 F.3d 65, 72, 98 & n.40 (2d Cir. 2011) (opining that *Weber* and *Johnson* continue to extend "to circumstances in which an employer has undertaken a race- or gender-conscious affirmative action plan designed to benefit all members of a racial or gender class in a forward-looking manner only").

As noted *supra*, the Government's argument is built primarily on two Supreme Court cases: *SFFA* and *Ames*. First, in *SFFA*, the Supreme Court

addressed the use of race in university admissions under the Equal Protection Clause and Title VI.  600 U.S. at 202–31.  There, the Supreme Court reiterated that the Equal Protection Clause protects persons, not groups, and that governmental decision-making based on race is inherently suspect.  *Id.* at 206-08.

Notably, the majority opinion in *SFFA* decision did not concern remedial employment measures adopted to resolve findings of discrimination under Title VII.  600 U.S. at 206–08.   Nor did the Supreme Court overrule any precedents recognizing the permissibility, in appropriate circumstances, of narrowly tailored remedial race-conscious measures designed to address demonstrated discrimination.  *See id.* at 206–07.

The second case is *Ames.*  Two years later, the Supreme Court in *Ames* rejected the notion that Title VII imposes different evidentiary burdens depending upon whether a plaintiff belongs to a majority or minority group, emphasizing that the statute draws no such distinction and protects all individuals equally.  605 U.S. at 309–10.

Together, *SFFA* and *Ames* may well be understood to reflect a broader jurisprudential trend.  These and other cases appear to reflect a movement away from group-based conceptions of equality and toward a textual and individual-centered understanding of anti-discrimination law.  These cases also lend some force to the Government's contention that race-conscious and sex-

conscious employment practices face increasing constitutional and statutory scrutiny.

The difficulty for the Government is that it cannot point to a single Supreme Court or Second Circuit decision holding that either *Weber* or *Johnson* is no longer good law. In *Weber*, the Court considered a voluntary affirmative action plan adopted pursuant to a collective-bargaining agreement to address a conspicuous racial imbalance in a traditionally segregated workforce. 443 U.S. at 198–99.

Although the plan necessarily took race into account in selecting participants for a training program, the Court concluded that Title VII did not prohibit "affirmative action plans designed to eliminate conspicuous racial imbalance in traditionally segregated job categories." *Weber*, 443 U.S. at 209.

Rather, the Court reasoned that Congress enacted Title VII to expand employment opportunities for historically excluded groups and did not intend to forbid every voluntary effort designed to eliminate the effects of entrenched racial disparities. *Weber*, 443 U.S. at 201–08.

*Johnson* extended the same principles to sex-conscious employment decisions by a public employer. The Supreme Court upheld a county transportation agency's consideration of sex and race as factors in a promotion decision where women and racial minorities remained significantly underrepresented in the relevant job category. *Johnson*, 480 U.S. at 631–42.

The Supreme Court emphasized that Title VII permits carefully tailored efforts to remedy manifest imbalances in traditionally segregated occupations, provided those efforts do not "unnecessarily trammel[ ]" the rights of other employees or "create[ ] an absolute bar to their advancement." *Johnson*, 480 U.S. at 637–40.

The consent decree at the heart of this litigation rests on substantially the same remedial rationale articulated in *Weber* and *Johnson*. The decree was originally negotiated to resolve claims that the City's hiring practices and civil-service testing regime produced significant underrepresentation of African-Americans and women within the city's police and fire departments.

Like the plans approved in *Weber* and *Johnson*, the consent decree was designed to increase participation by historically underrepresented groups in particular occupational categories. Importantly, the decree was not adopted to achieve racial balancing as an end in itself, nor was it premised upon some generalized notion of group diversity untethered to specific, identified disparities in municipal employment.

This distinction is a significant one. Much of the Supreme Court's recent jurisprudence has focused on legal issues that differ materially from the remedial employment measures considered in *Weber* and *Johnson*. In *SFFA*, for example, the Supreme Court rejected university admissions programs that relied upon race to achieve amorphous educational objectives such as diversity

and the exchange of ideas. 600 U.S. at 206–31. The Court found those objectives insufficiently measurable and insufficiently constrained to satisfy strict scrutiny. *Id.* By contrast, the parties adopted the consent decree at issue in this litigation to remedy specific race and sex disparities in certain identified employment positions. *See generally* Consent Decree.

The Government tries to avoid this reality by claiming this distinction is no longer tenable. According to the government, *SFFA* reaffirmed that constitutional and statutory protections run to individuals, not groups, and that "[e]liminating racial discrimination means eliminating all of it." U.S.'s Reply Br. at 14 (quoting 600 U.S at 206). From that general premise, the Government contends that the race-conscious and sex-conscious measures the Supreme Court approved in *Weber* and *Johnson* cannot be squared with the Supreme Court's contemporary antidiscrimination jurisprudence.

This argument is rejected. Recognizing tension between lines of existing precedent is not the same thing as concluding that one line has displaced the other. Whatever criticisms the Government now advances against *Weber* and *Johnson*, both cases remain binding Supreme Court precedent. This Court is not free to conclude that the Supreme Court has implicitly overruled its longstanding precedents. This is so even when subsequent decisions appear difficult to reconcile with older authority.

Lower courts are not free to declare the earlier cases effectively overruled. *See Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989) (cautioning lower courts that "this Court [has] the prerogative of overruling its own decisions."); *U.S. v. Rueth Dev. Co.*, 335 F.3d 598, 604–05 (7th Cir. 2003) (rejecting Rule 60(b)(5) relief where intervening precedent had undermined one rationale supporting the decree, explaining that "the mere fact that the Supreme Court has cast doubt on one of the complaint's legal bases is not a ground on which to reopen the case."); *cf. Gonzalez v. Crosby*, 545 U.S. 524, 536–37 (2005) (rejecting Rule 60 relief based on an intervening change in decisional law and observing that it is "hardly extraordinary" for later Supreme Court decisions to adopt a different legal interpretation than that applied when judgment was entered).

The second case cited by the Government—*Ames*—is likewise insufficient to justify Rule 60(b)(5) relief. In *Ames*, the Supreme Court examined the evidentiary burden applicable to Title VII plaintiffs and rejected a judicially created doctrine that imposed heightened requirements on so-called "reverse-discrimination" claims. *See* 605 U.S. at 309–313.

The Supreme Court's holding in *Ames* rested upon the statutory text and the principle that Title VII protects all individuals equally. *See* 605 U.S. at 309–313. But nothing in *Ames* addressed voluntary affirmative action plans, remedial consent decrees, or the continuing validity of *Weber* and *Johnson*.

Aside from *SFFA* and *Ames*, the Government also points to *Ricci v. DeStefano*, 557 U.S. 557 (2009), an older Supreme Court case that held an employer cannot intentionally discriminate on the basis of race merely to avoid a disparate-impact problem unless it has a "strong basis in evidence" to believe it would otherwise violate Title VII.  557 U.S. at 561–63.

However, *Ricci* is clearly distinguishable.  *Ricci* addressed an employer's unilateral decision to discard examination results; it did not address a court-approved remedial decree entered to resolve discrimination litigation.  *See id.*; *Brennan*, 650 F.3d at 72, 98 n.40 (distinguishing *Ricci* and applying *Weber* and *Johnson* to a forward-looking affirmative-action plan).  More importantly, the Supreme Court did not purport in *Ricci* to overrule *Weber* or *Johnson*.

The same is true of *Bostock v. Clayton County*, 590 U.S. 644 (2020), the fourth case on which the Government has relied.  The Supreme Court considered the meaning of the phrase "because of . . . sex" in Title VII and held that the statute prohibits discrimination based on sexual orientation and gender identity.  *See* 590 U.S. at 655–62.

Although *Bostock* employed a textual method of statutory interpretation that the Government believes is difficult to reconcile with *Weber* and *Johnson*, the Supreme Court did not discuss those decisions or cast doubt upon their continued validity.  Thus, like *SFFA*, *Ames*, and *Ricci*, *Bostock* does not supply the clear directive from the Supreme Court necessary to conclude that the

precedents most directly relevant here—particularly *Weber* and *Johnson*—no longer govern.

The Government correctly notes that the Supreme Court has instructed that "[a] consent decree must of course be modified if, as it later turns out, one or more of the obligations placed upon the parties has become impermissible under federal law." *Rufo*, 502 U.S. at 388.  And of course, if the Court were to conclude that the consent decree affirmatively required conduct prohibited by Title VII or the Constitution, then a modification (or perhaps even a dissolution) would be both appropriate and required.

But that principle presupposes that federal law actually prohibits the challenged obligation.  For the reasons already discussed, controlling precedent has not yet effected any such change.  *See Rufo*, 502 U.S. at 389 (explaining that "[t]o hold that a clarification in the law automatically opens the door for relitigation of the merits of every affected consent decree would undermine the finality of such agreements").

Neither *SFFA* nor *Ames* (nor *Ricci* or *Bostock*) addressed judicially approved remedial employment measures of the sort at issue here, and neither decision purported to overrule *Weber* or *Johnson*.  *See Shea v. Marco Rubio, et al.*, 2026 WL 275992, at *1–2 (D.D.C. Feb. 2, 2026) (rejecting the argument that *Ames* effected a significant change in Title VII law and noting that *Ames* "did not cite, much less overrule, *Johnson* or *Weber*").

Rule 60(b)(5) authorizes modification where existing law renders a decree impermissible; it does not authorize a court to treat directly applicable precedent as overruled based upon predictions regarding the future direction of the law. Modification would be required if the consent decree had become unlawful. But the Government has failed to demonstrate that such unlawfulness has occurred.

The Government's prognostications may ultimately prove correct: that the Supreme Court's modern antidiscrimination jurisprudence points toward a future reconsideration of *Weber* and *Johnson*. But anticipating such a development is not the role of a lower court.

This Court's obligation is to apply the law as it exists today. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("[I]f a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower court] should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions.") (quotation marks and modification omitted).

Because no controlling court has repudiated the legal foundation upon which the consent decree rests, the Court cannot conclude that intervening changes in law render continued enforcement of the decree inequitable within the meaning of Rule 60(b)(5).

### B. Fulfillment of the Consent Decree's Purpose

As noted *supra*, "substantial attainment of the decree's objective" can also justify Rule 60(b)(5) relief. *See Patterson*, 13 F.3d at 38. Although the Government does not meaningfully contend that the consent decree should be dissolved because its objectives have been achieved, the Court briefly addresses that issue for the sake of completeness.[1]

The burden of demonstrating such changed circumstances rests with the Government. *See Horne*, 557 U.S. at 447. The Court already rejected a substantially similar argument in 2021, concluding that the Government had "failed to prove that the substantial objectives of the consent decree have been met." *Alexander II*, 512 F. Supp. 3d at 373.

So the relevant question is what has materially changed since that round of motion practice. The answer is "nothing significant enough to grant the Government any relief." The present record certainly would not support a finding that the parties have achieved the decree's objectives.

Under the terms of the decree, the relevant inquiry is whether its "basic objectives" have been met. *See* Consent Decree ¶ 18. By its plain terms, the

---

[1] The Court recognizes that achievement of a decree's objectives and changed factual circumstances are not necessarily coextensive. *See, e.g.*, Patterson, 13 F.3d at 38 (distinguishing between changed circumstances and substantial attainment of a decree's objectives as separate considerations bearing on modification or termination). But the Government's motion appears to rest entirely on alleged changes in law. It identifies no independent factual development since this Court's 2021 decision that would warrant relief and does not seriously contend that the decree's objectives have been fully achieved. Accordingly, the Court addresses any residual factual arguments briefly and together.

parties entered the consent decree to remedy the longstanding underrepresentation of African-American individuals and women within Syracuse's police and fire departments, with the stated goal of achieving representation approximating that of the relevant labor force. *See* Consent Decree ¶¶ 6, 8(a); Vivenzio, 611 F.3d at 107.

The City has submitted evidence indicating that substantial disparities remain between the composition of those departments and the relevant labor market. *See* Powers Decl., Rusin Decl. at ¶ 11; Monds Decl. at ¶ 17; Dkt. No. 97-23 ("Pl.'s Br.") at 21. In 2024, the City's labor force consisted of approximately 24.6% African Americans and 51.3% women. *See* Dkt. No. 97-7 ("Powers Decl."), Ex. D; Pl.'s Br. at 21. As of January 2026, the Syracuse police department consisted of 369 sworn personnel, of whom 31 (8.4%) were African American and 66 (17.89%) were women. *See* Dkt. No. 97-4 ("Rusin Decl."); at ¶ 11; Pl.'s Br. at 21. The Syracuse fire department consisted of 386 personnel, of whom 73 (18.91%) were African American and 16 (4.15%) were women. *See* Dkt. No. 97-5 ("Monds Decl.") at ¶ 17; Pl.'s Br. at 21. African American and female representation varied considerably by rank, with lower representation generally observed in supervisory and command-level positions. *See id.*; Rusin Decl. at ¶ 11.

Substantial progress toward a decree's objectives is not the same thing as fulfillment of those objectives. On this record, the Court cannot conclude

that the decree's remedial objectives have been fulfilled.  Accordingly, to the extent dissolution could be justified on the ground that the decree has substantially accomplished its intended purpose, the record does not support such a finding.

## IV.    CONCLUSION

The Government's motion fails to satisfy the standard required to warrant Rule 60(b)(5) relief.

Therefore, it is

ORDERED that

The Government's Motion to Modify the Consent Decree under Rule 60(b)(5) is DENIED.

IT IS SO ORDERED.

Dated:  June 24, 2026
         Utica, New York.

David N. Hurd
U.S. District Judge